Sarah Uhlemann (DDC Bar No. 501328)*
Tanya Sanerib (DDC Bar No. 473506)*
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone: (206) 327-2344
         (206) 379-7363
Email:  suhlemann@biologicaldiversity.org
          tsanerib@biologicaldiversity.org

*Pro Hac Vice Admission Pending

Attorneys for Plaintiff Center for Biological Diversity

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity, | |
| Plaintiff, | Case No. |
| v. | Complaint for Declaratory and Injunctive Relief |
| U.S. Fish and Wildlife Service; and Debra Haaland, in her official capacity as Secretary of the U.S. Department of the Interior, | |
| Defendants. | |

## INTRODUCTION

1.     Plaintiff Center for Biological Diversity challenges the U.S. Fish and Wildlife Service and Secretary of the Interior Debra Haaland's (collectively "the Service" or "Defendants") findings that listing seven imperiled, foreign wildlife species under the Endangered Species Act ("ESA" or "the Act") is "warranted" but nonetheless "precluded" by other pending listing proposals and that the Service is making

"expeditious progress" to add other species to the ESA list. 16 U.S.C. § 1533(b)(3)(B)(iii). The Service's findings are arbitrary and capricious and violate the ESA, or in the alterative, the Administrative Procedure Act ("APA").

2.      The Earth is experiencing an unprecedented, human-caused extinction crisis. In 2019, the United Nations' Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services warned that the current rate of global species extinction is tens to hundreds of times greater than average over the last 10 million years and that approximately one million species are threatened with extinction.

3.      The ESA has a successful track-record of stopping species' extinctions, but species only gain the ESA's protections if the Service lists them as "endangered" or "threatened" under the Act. 16 U.S.C. § 1533(a), (b).

4.      Despite the ongoing extinction crisis, the Service listed few species as endangered or threatened in recent years. The Service made particularly little progress on listing foreign species, which are species that do not occur in the wild within U.S. territory. The Service listed only seven foreign species throughout President Trump's four-year tenure and only one foreign species since then.

5.      Over a dozen foreign "candidate" species—species that the Service has already found "warrant" protection under the ESA—are awaiting listing decisions, and some have been waiting for decades. Among those candidates are the seven foreign species addressed in this litigation: Okinawa woodpecker, Kaiser-i-hind swallowtail, Jamaican kite swallowtail, black-backed tanager, Harris' mimic swallowtail, fluminense swallowtail, and southern helmeted curassow.

6.      Yet the Service claims that it made "expeditious progress" in adding foreign species to the lists of endangered and threatened species in recent years. 86 Fed. Reg. 43,470 (Aug. 9, 2021).

7.      The Service also claims its ability to complete the ESA rulemakings for these seven species is impeded by the agency's focus on higher priority foreign listing

activities. Yet the Service has missed its own internal timelines for these priorities that are set forth in its 2020 foreign species workplan.

8.    The seven species are languishing in regulatory limbo, deserving but doing without the Act's protections. At least 47 species have gone extinct while waiting for protection under the ESA.

9.    There is no legal justification for the Service's foot-dragging and bureaucratic delays. Rather, the Service's warranted-but-precluded findings for the seven species violate the ESA because the Service has not made "expeditious progress" in adding qualified foreign species to the endangered or threatened species lists and because the Service has not shown that the immediate proposal and prompt final listing of the seven species is "precluded" by pending proposals for higher-priority species. 16 U.S.C. § 1533(b)(3)(B)(iii).

10.    Plaintiff Center for Biological Diversity ("the Center") brings this lawsuit under the ESA's citizen-suit provision, or in the alternative, under the APA, to challenge the Service's arbitrary and capricious and unlawful refusal to protect these seven species in violation of the ESA. 16 U.S.C. §§ 1540(g)(1)(C), 1533(b)(3)(C)(ii); 5 U.S.C. § 706.

**JURISDICTION AND VENUE**

11.    This Court has jurisdiction pursuant to the citizen suit provision of the ESA. 16 U.S.C. §§ 1540(c), (g), 1533(b)(3)(C)(ii). The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA or, alternatively, the APA, 5 U.S.C. § 702. The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201–2202; 5 U.S.C. § 706; and the Court's equitable powers.

12.    The ESA and APA provide waivers of the federal government's sovereign immunity. 16 U.S.C. § 1540(g); 5 U.S.C. § 702.

13.    Venue is proper in the District of Arizona under 28 U.S.C. § 1391(e) because this is an action against agencies and officers of the United States and Plaintiff

3

Center for Biological Diversity maintains its principal place of business in this judicial district.

14.     Assignment of this case to the Tucson Division is appropriate because Plaintiff Center for Biological Diversity has its principal place of business in Pima County. LRCiv 77.1(a), (c).

15.     In compliance with 16 U.S.C. § 1540(g)(2)(C), the Center gave Defendants notice of the Center's intent to file suit under the ESA for the violations described in this Complaint more than 60 days ago.

16.     Defendants have not remedied their continuing ESA and APA violations as of the date of this Complaint. Therefore, an actual controversy exists between the Parties under 28 U.S.C. § 2201.

## PARTIES

**A.     Plaintiff**

17.     The Center for Biological Diversity ("the Center") is a non-profit corporation headquartered in Tucson, Arizona, with offices throughout the United States and in Mexico. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues. The Center's International Program works to protect global biodiversity by using U.S. and international law to protect imperiled species wherever they are found. The Center has more than 89,000 members throughout the United States and the world.

18.     The Center routinely petitions for the listing of imperiled species as endangered or threatened, including foreign species that inhabit regions outside U.S. borders. On behalf of itself and its members, the Center has an interest in the effective implementation of the ESA and the timely listing of endangered and threatened species, including the timely listing of imperiled species for which the Center and others have submitted listing petitions.

19.     The Center brings this action on behalf of itself and its many members. Plaintiff's members and supporters derive professional, scientific, educational, recreational, conservation, aesthetic, and other benefits from viewing wildlife in the wild, including the seven species at issue in this case. Plaintiff's members regularly visit or have concrete plans to visit habitat for each of the seven species.

20.     For example, Mr. Brett Hartl is a Center member and avid traveler who regularly looks for, photographs, and records videos of wildlife both in the United States and globally. Mr. Hartl has observed hundreds of mammal species and thousands of bird species around the world and has a life goal of seeing many more mammals, birds, and other wildlife species, including butterflies.

21.     Mr. Hartl has booked a trip to Bhutan and India for February 2022 specifically to look for and photograph wildlife. He will be traveling throughout several regions of Bhutan and the Himalayan region of India, including in the habitat of the Kaiser-i-hind swallowtail, with knowledgeable wildlife guides. While there, he will be looking to see the Kaiser-i-hind swallowtail, among other imperiled wildlife species, to photograph, document, and enjoy.

22.     Mr. Hartl has visited Jamaica and the habitat of the Jamaican kite swallowtail. During his March 2020 trip, Mr. Hartl visited the mountainous regions on both the western and eastern sides of the island to look for wildlife, including birds and butterflies. However, he was unable to see several of the species he had hoped to view because his trip was cut short due to the pandemic. Mr. Hartl plans to return to Jamaica in three years to once again attempt to see several rare Jamaican species, including the Jamaican kite swallowtail.

23.     Mr. Hartl also has specific plans to visit Brazil in August 2023. While he will spend most of his trip viewing species in the Brazilian Pantanal, Mr. Hartl plans to spend a few days visiting the coastal Atlantic Forest region to view species, including the black-backed tanager, fluminense swallowtail, and Harris' mimic swallowtail.

24.     Center member Peter Galvin frequently visits the island of Okinawa, Japan, to view wildlife. Mr. Galvin has been to Okinawa five times and saw an Okinawa woodpecker on one of these visits. He is planning his sixth visit to Okinawa in February 2023. While there, Mr. Galvin will visit the habitat of the Okinawa woodpecker and other rare wildlife to search for woodpeckers.

25.     Celina Yoshihara is a Center member who lives in Bertioga, located in the coastal Atlantic Forest region of southeastern Brazil. Ms. Yoshihara works as a Coordinator at a protected area within the habitat of the black-backed tanager, where she surveys local species through catch, biomonitoring, and release and assists with wildlife rehabilitation. Ms. Yoshihara has been involved in dozens of catch-and-release events for black-backed tanagers over her career. She has also personally assisted in rehabilitating several black-backed tanagers brought in by authorities, all likely caught for breeding to supply the illegal pet trade. She enjoys viewing and studying the tanagers and plans to continue her work with the species in the future.

26.     Center member Salvatore Sicialiano lives in Rio de Janeiro, Brazil, and works as a biologist with a general focus on zoology and specific focus on marine mammalogy. His family has owned a home near Cabo Frio for decades, where Mr. Sicialiano regularly spends his weekends. His family home is within the habitat of the fluminense swallowtail, and Mr. Sicialiano sees fluminense swallowtail butterflies about once a year. Mr. Sicialiano also visits the habitat of the Harris' mimic swallowtail regularly, which is near his family home, both for his field work and personal reasons. He plans to continue to look for both butterflies in his regular visits to their habitat in the future.

27.     Tjalle Boorsma is a Center member who lives in Sierra Cruz de la Sierra in central Bolivia. Mr. Tjalle has had a life-long passion for birds, including watching and studying them. Mr. Tjalle works for Asociación Armonía, a non-profit organization dedicated to protecting Bolivia's natural heritage while supporting local communities. He is working with the organization's Horned Curassow Program to develop a conservation

plan for the southern helmeted curassow. Mr. Tjalle visited the southern helmeted curassow's habitat in 2018 and plans to return this year to assist with a population survey that Armonía will be conducting.

28.     Ms. Camila Cossio is also a Center member and an avid hiker. Ms. Cossio has traveled to Bolivia on numerous occasions in the past to visit her extended family. On these past trips, Ms. Cossio has hiked, including near Cochabamba, and she is particularly interested in Bolivian wildlife. Ms. Cossio has booked a trip to Villa Tunari near Cochabamba in February 2022 with her father to hike and view wildlife with a knowledgeable guide. They plan to visit the southern helmeted curassow's habitat to try to view the bird.

29.     Center members will enjoy their visits to the habitat of the seven species less and see fewer individuals of the species as the species' populations continue to decline due to habitat destruction, collection, trade, hunting, actions by the U.S. government, and other impacts.

30.     Defendants' violations have directly, adversely, and irreparably harmed Plaintiff and its members' interests in the seven species addressed in this Complaint. This harm is ongoing and will continue unless and until this Court provides the relief prayed for in this Complaint.

31.     The relief sought in this Complaint would redress Plaintiff's injuries. ESA listings would provide the seven species with important protections and benefits. The ESA generally bans the import, export, and sale in interstate and foreign commerce of endangered species, 16 U.S.C. § 1538(a), and requires the Service to issue regulations deemed "necessary and advisable" for the conservation of threatened species. *Id.* § 1533(d).

32.     The ESA also provides for international cooperation in the conservation of foreign species. The statute requires the Service to, *inter alia*, "encourage foreign countries to provide for the conservation of . . . species listed" under the ESA and to

"enter[ ] into . . . bilateral or multilateral agreements with foreign countries to provide for such conservation." 16 U.S.C. § 1537(b)(1), (2).

33.     ESA listing also increases awareness of imperiled species and their threats. It stimulates research efforts to address conservation needs and increases funding for conservation of species in their range countries, including habitat conservation. Under the ESA, the Service provides financial assistance for programs to conserve listed species in foreign countries, encourages conservation programs for such species, and offers other related assistance, such as personnel and training.

**B.     Defendants**

34.     Defendant U.S. Fish and Wildlife Service is a federal agency within the U.S. Department of the Interior with delegated primary authority for administration of the ESA with respect to terrestrial species. 50 C.F.R. § 402.01(b). The Service is responsible for the violations alleged in this Complaint.

35.     Defendant Debra Haaland is U.S. Secretary of the Interior. In this capacity, Secretary Haaland has the ultimate responsibility to administer and implement the provisions of the ESA regarding the seven species at issue in this suit and to comply with all other federal laws applicable to the U.S. Department of the Interior. Plaintiff sues Defendant Secretary Haaland in her official capacity, and in this capacity, Secretary Haaland is responsible for the violations alleged in this Complaint.

**STATUTORY AND REGULATORY FRAMEWORK**

36.     Congress passed the ESA "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and the "plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

37.     When enacting the ESA, Congress declared that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall

utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C.
§ 1531(c)(1).

38.     The ESA provides substantive protection for "species" once they are listed
as "endangered" or "threatened." 16 U.S.C. §§ 1533, 1538. A "species" is defined as
"any subspecies of fish or wildlife or plants." *Id.* § 1532(16). An "endangered species" is
"any species which is in danger of extinction throughout all or a significant portion of its
range," and a "threatened species" is "any species which is likely to become an
endangered species within the foreseeable future throughout all or a significant portion of
its range." *Id.* § 1532(6), (20).

39.     The Service must list a species as endangered or threatened based on the
presence of any one or more of five statutory factors: "(A) the present or threatened
destruction, modification, or curtailment of its habitat or range; (B) overutilization for
commercial, recreational, scientific, or educational purposes; (C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade
factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). The Service must base
its listing determinations "solely on . . . the best scientific and commercial data
available." *Id.* § 1533(b)(1)(A); 50 C.F.R. § 424.11(b).

40.     Certain protections apply once a species is listed under the ESA.

41.     Section 7(a) of the ESA requires that each federal agency "shall . . . utilize
[its] authorities . . . [to] carry[ ] out programs for the conservation" of listed threatened
and endangered species. 16 U.S.C. § 1536(a)(1).

42.     If a species is listed as "endangered," Section 9 of the ESA prohibits any
person from, among other things, (1) importing or exporting the species, (2) transporting
the species "in the course of a commercial activity" in either interstate or foreign
commerce, (3) selling or offering for sale the species in interstate or foreign commerce,
and (4) violating any relevant ESA regulation, unless exceptions apply. 16 U.S.C.
§ 1538(a)(1).

43.     If the Service lists a species as threatened, the Service "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation of such species," and the agency may prohibit any act listed under Section 9 of the ESA. 16 U.S.C. §§ 1533(d), 1538(a)(1).

44.     Further, the ESA authorizes the Service to provide financial and other assistance for programs that conserve foreign, ESA-listed species. 16 U.S.C. § 1537(a). The ESA also authorizes and directs the Service through the U.S. Secretary of State to encourage foreign nations to conserve listed species and enter the United States into treaties and other agreements to provide for conservation. *Id.* § 1537(b)(1)–(2).

45.     The ESA provides a process with mandatory deadlines for the Service to respond to a petition from any "interested person" to list a species as endangered or threatened. 16 U.S.C. § 1533(b)(3).

46.     "To the maximum extent practicable, within 90 days after receiving the petition of an interested person," the Service must make an initial finding "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); *see* 50 C.F.R. § 424.14(h)(1). This is referred to as a 90-day finding.

47.     Within 12 months after receiving a petition that is found "to present substantial information indicating that the petitioned action may be warranted," the Service must make one of three findings: (1) the petitioned action is "not warranted," (2) the petitioned action is "warranted," or (3) the petitioned action is "warranted but . . . precluded." 16 U.S.C. § 1533(b)(3)(B)(i)–(iii). This is referred to as a 12-month finding.

48.     If the Service finds that a petitioned action is warranted but precluded, it must show both that (1) "the immediate proposal and timely promulgation of a final regulation . . . is precluded by pending proposals to determine whether any species is an endangered species or a threatened species," and (2) the Service is making "expeditious progress . . . to add qualified species" to the endangered and threatened species lists "and to remove from such lists species for which the protections of the Act are no longer

necessary." 16 U.S.C. § 1533(b)(3)(B)(iii). A warranted-but-precluded determination and the Service's delay in listing a species is only lawful under these "limited conditions" and may not be used to justify "the foot-dragging efforts of a delinquent agency." H.R. Rep. No. 97-835, at 22 (1982) (Conf. Rep.), *as reprinted in* 1982 U.S.C.C.A.N. 2860, 2863.

49.     If the Service makes a warranted-but-precluded finding, the Service "shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based." 16 U.S.C. § 1533(b)(3)(B)(iii).

50.     If the Service determines that a petition to list a species is warranted but precluded, the Service must treat that petition "as a petition that is resubmitted to the [Service] . . . on the date of such finding." 16 U.S.C. § 1533(b)(3)(C)(i). Hence, the Service must make a new determination within 12 months as to whether the species will finally be listed or again be denied the Act's protections on the grounds that its listing is still precluded by other listing activities. *Id.*

51.     The Service publishes these "recycled" 12-month findings for warranted-but-precluded species in a document called a "Candidate Notice of Review" ("CNOR"), which is published in the Federal Register.

52.     The Service typically publishes one CNOR covering domestic candidate species (i.e., candidate species that inhabit the United States) and a separate CNOR for foreign candidate species. The Service issued a separate foreign species CNOR in 2008, 2009, 2011, 2013, 2016, and 2021.

53.     CNORs include species that the Service has determined to be "candidates" for listing. Candidates are species for which the Service has "on file sufficient information on biological vulnerability and threats to support issuance of a proposal for listing as endangered or threatened, but for which preparation and publication of a proposal is precluded by higher priority listing actions." 86 Fed. Reg. 43,470, 43,471 (Aug. 9, 2021). Candidate species are plants and animals that received warranted-but-precluded listing determinations. Although the agency has determined that all candidate

species should be listed based on the best available data—meaning the Service believes the species need ESA protections to survive—candidates receive none of the Act's substantive protections.

54.     The Service applies "listing priority guidelines" to "determine relative priorities of outstanding actions." 86 Fed. Reg. 43,470, 43,476 (Aug. 9, 2021). Under this system, the Service assigns candidates a "listing priority number" of one to 12. *Id.* at 43,471. Lower numbers signify higher listing priority. *Id.*

55.     Upon information and belief, the Service maintains separate budgets for its Branch of Delisting and Foreign Species and its Branch of Domestic Listing.

56.     Upon information and belief, the Service allocates funds for its Branch of Delisting and Foreign Species to work on foreign species listings and delistings, and the Service allocates separate funds for its Branch of Domestic Listing to work on domestic species listings.

## FACTUAL BACKGROUND

### A.     The Seven Imperiled Species

#### *Okinawa Woodpecker*

57.     The Okinawa woodpecker (*Dendrocopos noguchii*) "is one of the world's rarest woodpeckers" and is found only on Okinawa Island in Japan. 86 Fed. Reg. 43,470, 43,485 (Aug. 9, 2021). The woodpecker prefers undisturbed and mature subtropical evergreen broadleaf forests and is now restricted to the northern part of Okinawa Island due to habitat destruction. *Id.*

58.     Most of the Okinawa woodpecker's habitat occurs within the U.S. Jungle Warfare Training Center, part of a U.S. Marine Corps installation on Okinawa Island.

59.     The International Union for Conservation of Nature ("IUCN") has deemed the species "Critically Endangered." IUCN's RedList Assessment estimates that only 50–249 mature individuals remain.

60.     The Okinawa woodpecker population "is very small and is likely declining." 86 Fed. Reg. at 43,485–86.

61.     The main cause of the Okinawa woodpecker's population decline is reduced habitat and deforestation. 86 Fed. Reg. at 43,485. By the mid-1990s, only 15 square miles of suitable habitat remained for the species. *Id.*

62.     The Service considers the threats to the Okinawa woodpecker to be imminent and high in magnitude. 86 Fed. Reg. at 43,486.

***Kaiser-i-hind swallowtail***

63.     The Kaiser-i-hind swallowtail (*Teinopalpus imperialis*) is large and ornate with green, black, and orange coloring. 86 Fed. Reg. 43,470, 43,488 (Aug. 9, 2021). The butterfly inhabits the Himalayan regions of Bhutan, China, India, Laos, Myanmar, Nepal, Thailand, and Vietnam, preferring undisturbed, high-altitude forests. *Id.*

64.     Although the Kaiser-i-hind swallowtail has a relatively large range, it occurs only locally within this range and is restricted to higher elevations. 86 Fed. Reg. at 43,488. It is generally considered rare. *Id.*

65.     Habitat destruction and disturbance is one of the primary, ongoing threats to the species. 86 Fed. Reg. at 43,488.

66.     Collection for commercial trade also threatens the Kaiser-i-hind swallowtail. The butterfly is highly valued and is collected and traded despite restrictions.

67.     The Kaiser-i-hind swallowtail is included in Appendix II of the Convention on International Trade in Endangered Species ("CITES"). The CITES database documents trade in the species, including imports of wild-sourced individuals into the United States.

68.     The species remains available for purchase online in the United States. For example, on November 15, 2021, a Kaiser-i-hind swallowtail was available to purchase for $320 USD. The butterfly was also for sale on another website for €1,450 (around $1,750 USD). Many other Kaiser-i-hind swallowtails are available for purchase on the same website.

69.     IUCN assessed the Kaiser-i-hind swallowtail as "Near Threatened" in 1996. 86 Fed. Reg. at 43,489. However, IUCN indicates that its assessment needs updating. *Id.*

70.     The Service considers the Kaiser-i-hind swallowtail's threats to be imminent and of moderate magnitude. 86 Fed. Reg. at 43,489.

***Jamaican kite swallowtail***

71.     The Jamaican kite swallowtail (*Protographium marcellinus*, syn. *Eurytides marcellinus*) is a small, blue-green and black butterfly. 86 Fed. Reg. 43,470, 43,488 (Aug. 9, 2021).

72.     The species is described as Jamaica's most endangered butterfly. 86 Fed. Reg. at 43,488. There is no estimate of the species' population size. *Id.* Subpopulations are known from five sites; two of these may have been recently extirpated and one subpopulation's status is tenuous. *Id.* Thus only two subpopulations may be currently viable. *Id.*

73.     The species relies on rare, dense stands of a single host plant. 86 Fed. Reg. at 43,488.

74.     The Jamaican kite swallowtail is threatened by habitat degradation, fragmentation, and loss. 86 Fed. Reg. at 43,488.

75.     Collection and trade also threaten the species.

76.     In 2017, three Jamaican kite swallowtails were noted for sale on the internet for as much as $120 USD. 86 Fed. Reg. at 43,488. In 2015, one sold for $178 USD. *Id.*

77.     The butterfly remains available for purchase online in the United States. For example, one business advertised a Jamaican kite swallowtail for sale for €60 (around $68 USD). The same business advertised another Jamaican kite swallowtail for sale for €150 (around $180 USD).

78.     IUCN has assessed the Jamaican kite swallowtail as "Vulnerable" since 1985 but also notes its assessment needs updating. 86 Fed. Reg. at 43,488.

79.     The Service considers the threats to the Jamaican kite swallowtail to be imminent and of high magnitude. 86 Fed. Reg. at 43,488.

***Black-backed tanager***

80.     The black-backed tanager (*Tangara peruviana*) inhabits the coastal Atlantic Forest region of southeastern Brazil, in the States of Espirito Santo, Rio de Janeiro, São Paulo, Paranà, Santa Catarina, and Rio Grande do Sul. 86 Fed. Reg. 43,470, 43,484 (Aug. 9, 2021). The tanager is restricted to restinga sand-forest habitat. *Id.*

81.     The species' population estimate is only between 2,500 and 10,000 individuals. 86 Fed. Reg. at 43,484. Populations are small, fragmented, and declining. *Id.*

82.     The black-backed tanager is threatened by habitat loss, destruction, and fragmentation primarily from development, and rising sea levels contribute to this threat. 86 Fed. Reg. at 43,488.

83.     The black-backed tanager is found in the pet trade.

84.     IUCN classifies the black-backed tanager as "Vulnerable." 86 Fed. Reg. at 43,488.

85.     The Service considers the threats to the black-backed tanager to be imminent and of moderate magnitude. 86 Fed. Reg. at 43,488.

***Harris' mimic swallowtail***

86.     The Harris' mimic swallowtail (*Mimoides lysithous harrisianus*) is a subspecies that is mostly black with white and rose-red markings.

87.     The subspecies inhabits the restinga sand-forest habitat within Brazil's coastal Atlantic Forest region. 86 Fed. Reg. 43,470, 43,487 (Aug. 9, 2021). The species is currently known to occupy only five sites within State of Rio de Janeiro. *Id.*

88.     The Harris' mimic swallowtail is threatened by habitat destruction and fragmentation from development and fire, as well as sea-level rise. 86 Fed. Reg. at 43,487.

89.     The Harris' mimic swallowtail is also threatened by collection for trade.

90.     Harris' mimic swallowtails have been advertised for sale online for up to $2,200 USD. 86 Fed. Reg. at 43,488. The species is in high demand for trade. *Id.* On June 15, 2021, a Harris' mimic swallowtail was available to purchase for €895 (approximately

$1,180 USD). On November 15, 2021, another Harris' mimic swallowtail specimen was available to purchase for €990 (approximately $1,017 USD).

91.   IUCN has not assessed the Harris' mimic swallowtail.

92.   The Service considers the threats to the Harris' mimic swallowtail to be imminent and of high magnitude. 86 Fed. Reg. at 43,488.

***Fluminense swallowtail***

93.   The fluminense swallowtail (*Parides ascanius*) is a black and white butterfly with dusty rose and bright, pink-red markings. The species' habitat occurs in Brazil's coastal Atlantic Forest region within the State of Rio de Janeiro. 86 Fed. Reg. 43,470, 43,486 (Aug. 9, 2021).

94.   Scientists estimate the species has declined from fewer than 20 colonies in 1994 to eight to 12 colonies in 2017, and the number of individuals within each subpopulation has also declined. 86 Fed. Reg. at 43,486.

95.   The fluminense swallowtail is threatened by habitat fragmentation, loss, and degradation from development, road building, drainage of swamps, vegetation suppression, and fire. 86 Fed. Reg. at 43,486.

96.   The fluminense swallowtail is threatened by collection for trade.

97.   Specimens of this swallowtail butterfly have been advertised for sale online for up to $700 USD. 86 Fed. Reg. at 43,487. On November 15, 2021, a fluminense swallowtail was available to purchase online from one retailer for $350. The European Union protects the species under its Wildlife Trade Regulations, requiring an import permit. 86 Fed. Reg. at 43,487.

98.   IUCN classifies the fluminense swallowtail as "Vulnerable." 86 Fed. Reg. at 43,487.

99.   The Service considers the threats to the fluminense swallowtail to be imminent and of high magnitude. 86 Fed. Reg. at 43,487.

*Southern helmeted curassow*

100.   The southern helmeted curassow (*Pauxi unicornis*) is a large bird with black feathers and a distinctive, pale-blue casque on its head. The bird inhabits only central Bolivia's eastern slope of the Andes Mountains in a narrow altitudinal band of foothills and lower montane forests. 86 Fed. Reg. 43,470, 43,481 (Aug. 9, 2021).

101.   The bird's population is declining, and IUCN estimates that only between 1,500 and 7,500 individuals remain.

102.   The species is threatened by habitat loss and hunting. 86 Fed. Reg. at 43,481. Although much of the species' habitat occurs within Bolivian protected areas, these national parks are not effectively protected from logging, road building, or development. *Id.*

103.   The southern helmeted curassow is not protected under CITES. However, the Netherlands proposed listing the species under CITES Appendix II in 1997, noting, "[t]here may or could be a market in ornamental use of the [species'] helmet" (its casque) and that individuals were captured for breeding for a private collection in Mexico. CITES, CoP10, Prop. 10.39.

104.   The European Union protects the species under its Wildlife Trade Regulations, noting that the species "warrant[s] monitoring of trade levels." 86 Fed. Reg. at 43,482.

105.   IUCN has assessed the southern helmeted curassow as "Critically Endangered." 86 Fed. Reg. at 43,481

106.   The Service considers the threats to the southern helmeted curassow to be imminent and of high magnitude. 86 Fed. Reg. at 43,482.

**B.   The Species' Listing Petitions and the Service's Warranted But Precluded Findings**

107.   Due to the imminent threats confronting the species, the International Council for Bird Preservation (now BirdLife International) submitted an ESA petition to list the Okinawa woodpecker on November 28, 1980. 46 Fed. Reg. 26,464 (May 12,

1981). The Service issued a 90-day finding that listing the woodpecker may be warranted in 1981, more than 40 years ago. *Id*.

108.    The Service received a petition from the International Council for Bird Preservation to list the black-backed tanager and southern helmeted curassow on May 6, 1991. 56 Fed. Reg. 65,207, 65,208 (Dec. 16, 1991). The Service issued a 90-day finding that listing both birds may be warranted in 1991, more than 29 years ago. *Id*. at 65,207–08.

109.    Ms. Dee E. Warenycia, a Center member, submitted a petition to list the Kaiser-i-hind swallowtail, Jamaican kite swallowtail, fluminense swallowtail, and Harris' mimic swallowtail under the ESA on January 10, 1994. 59 Fed. Reg. 24,117 (May 10, 1994). The Service issued 90-day findings on the petition in 1994, more than 27 years ago, in which it determined that listing the four butterflies may be warranted. *Id*.

110.    The Service has put off protections for the seven species for decades, repeatedly finding their listing was "warranted but precluded" by other listing actions, despite the threats confronting these species.

111.    In 2019, the Service issued a Candidate Notice of Review, again finding each of the seven species' listing was warranted but precluded. 84 Fed. Reg. 54,732 (Oct. 10, 2019).

112.    Because the ESA requires the Service to, within 12 months of issuing a warranted but precluded finding, make a new finding whether listing is then-warranted for the species, 16 U.S.C. § 1533(b)(3)(C)(i), the Service was required to issue new findings for the seven species by October 2020.

113.    When the Service failed to timely issue the required findings, Plaintiff filed a complaint alleging the Service violated the ESA. Complaint, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 21-cv-251-TUC-RCC (D. Ariz. June 23, 2021).

114.    The Service then issued a new foreign CNOR containing findings for the seven species in August 2021, 86 Fed. Reg. 43,470 (Aug. 9, 2021), and Plaintiff

voluntarily dismissed its complaint. Notice of Vol. Dismissal, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 21-cv-251-TUC-RCC (D. Ariz. Aug. 11, 2021), ECF No. 7.

115.   In its August 2021 CNOR, the Service once again found that listing of the seven species is warranted—i.e., that the species are in danger of extinction now or in the foreseeable future and in need of the Act's protections. 86 Fed. Reg. at 43,481. Yet once again, the agency did not propose listing any of the seven species. The Service instead attempted to justify its foot-dragging by claiming it has been making expeditious progress in listing and de-listing other species and that listing these seven species is precluded by these and other actions. *Id.* at 43,476–77.

**1.  Lack of "Expeditious Progress"**

116.   To justify its warranted-but-precluded determinations for the seven species, the Service claimed that it has been making expeditious progress in adding qualified species to the lists of endangered and threatened species. 86 Fed. Reg. 43,470, 43,476–77 (Aug. 9, 2021).

117.   However, the Service listed *only one foreign species* throughout fiscal years 2019 and 2020, the timeframe covered in the Service's most recent CNOR. 86 Fed. Reg. at 43,476.

118.   The Service listed just seven foreign species during the entire four years of the Trump administration—a rate of fewer than two species per year.

119.   By comparison, the Service listed a total of 53 foreign species during the eight years of the Obama administration, a rate of more than six foreign species per year.

120.   Moreover, the Service's August 2021 CNOR fails to address the Service's progress in listing species in fiscal year 2021, even though fiscal year 2021 ended just a month after the CNOR was published, in September 2021. The Service listed only one foreign species during fiscal year 2021.

121.   The Service attempted to blame its paltry rate of foreign listings in recent years on insufficient funding from Congress. 86 Fed. Reg. at 43,476. However, the

Service has listed far more foreign species with similar resources in the past. The Service's budget for listing has remained consistently between approximately $18–22 million since 2008 during the Obama administration and remained the same during the Trump administration. Yet during the Trump administration the Service listed a fraction of the foreign species listed during the Obama administration.

122.    The Service also attempted to justify its delay by pointing to the agency's work to "down-list" one foreign species from "endangered" to "threatened." 86 Fed. Reg. at 43,477. However, the number of species that lose protections under the Act cannot, by itself, support a "warranted but precluded" finding, which requires the Service to demonstrate that it is making "expeditious progress" both in adding species to endangered and threatened species lists and in removing any recovered species from the lists. 16 U.S.C. § 1533(b)(3)(B)(iii)(II). In addition, the appropriations for de-listing are separate from those for listings, so the amount of money spent on the former cannot detract from the funds available for listing. 86 Fed. Reg. at 43,474 (indicating that removing species from the list is not subject to the same funding cap).

123.    The agency also pointed to its purported progress in listing domestic species. 86 Fed. Reg. at 43,477. However, domestic species listings are conducted by a separate branch of the Service. The Service also already relied on those actions, which are covered by a distinct domestic species workplan, in its domestic species CNOR, an entirely separate final agency action. 85 Fed. Reg. 73,164, 73,167 (Nov. 16, 2020). The agency has elected to divide its work on foreign and domestic species and issue separate foreign and domestic CNORs, as it has done historically, and its reliance on domestic listing actions to justify its delay in undertaking foreign listing actions is arbitrary and capricious.

124.    The Service failed to fully describe or evaluate its lack of progress, and its conclusion that it has made expeditious progress is arbitrary and capricious and contrary to the ESA. 16 U.S.C. § 1533(b)(3)(B); 5 U.S.C. § 706(2).

### 2. Supposed "Preclusion"

125. To justify its warranted-but-precluded findings, the Service also claimed that issuing a proposed and timely final rule for the seven species is "precluded by higher priority listing actions." 86 Fed. Reg. 43,470, 43,473 (Aug. 9, 2021).

126. The Service fails to detail which higher-priority foreign species preclude "the immediate proposal and timely promulgation of a final" listing determination for each of the seven foreign species. 16 U.S.C. § 1533(b)(3)(B)(iii)(I). Instead, it points to its foreign species workplan for completing 12-month findings and final rules. 86 Fed. Reg. at 43,475. But the Service never demonstrates, describes, or evaluates how this work actually precludes the immediate listing of each of the seven species. 16 U.S.C. § 1533(b)(3)(B)(iii).

127. Moreover, the Service has largely failed to implement its 2020 workplan, upon which its August 2021 warranted-but-precluded findings are based. The Service's 2020 workplan, released in June 2020, outlines the Service's timelines for 12-month and final listing decisions for six years, covering fiscal years 2020 to 2026.

128. Under its workplan, the Service planned four listing actions for fiscal year 2020; the Service issued *none* of those actions that year. The Service planned 11 listing actions (six 12-month findings and five final listings) for fiscal year 2021; the Service issued only four of those actions that fiscal year, and only one of those actions was completed by the date the Service issued its warranted-but-precluded findings. The Service cannot rely on a workplan it has failed to implement to justify precluding the listing of these seven severely imperiled species.

129. The Service failed to fully describe or evaluate whether the seven species' listings are precluded, and its conclusion that the species are precluded is arbitrary and capricious and contrary to the ESA. 16 U.S.C. § 1533(b)(3)(B)(iii); 5 U.S.C. § 706(2).

# CLAIMS FOR RELIEF

### First Claim for Relief
### (ESA Citizen Suit Claim)

**The Service's "Warranted but Precluded" Findings Fail to Show the Service is Making Expeditious Progress to Add Species to the Lists of Endangered or Threatened Species and that Listing The Seven Species is Precluded by Pending Proposals to Determine Whether Any Species is an Endangered or Threatened Species**

130.  The Center re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

131.  The Service can find the prompt listing of a species is "warranted but precluded" only if "expeditious progress is being made to add qualified species to [the lists of endangered or threatened species] and to remove from such lists species for which the protections of the Act are no longer necessary" and "the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . . is precluded by pending proposals to determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(b)(3)(B)(iii).

132.  If the Service is not making expeditious progress to add species to the lists of endangered and threatened species or if listing a species is not precluded by other pending proposals, the Service must immediately propose and timely promulgate a final listing determination. 16 U.S.C. § 1533(b)(3)(B)(iii)(I).

133.  The Service is not making expeditious progress to add species to the lists of endangered and threatened species, and the Service has failed to show that the prompt listing of the Okinawa woodpecker, Kaiser-i-hind swallowtail, Jamaican kite swallowtail, black-backed tanager, Harris' mimic swallowtail, fluminense swallowtail, and the southern helmeted curassow is precluded by pending proposals to determine whether any species is an endangered or threatened species.

134.  The Service is denying vital ESA protections to these seven species in violation of its mandatory duties imposed by the ESA, and its failure to make prompt

listing determinations for the seven species is arbitrary and capricious and in violation of the ESA. 16 U.S.C. § 1533(b)(3)(B)(iii); 5 U.S.C. § 706(2).

**Second Claim for Relief**
**(in the Alternative to Plaintiff's First Claim for Relief)**
**(APA Claim)**

**The Service's "Warranted but Precluded" Findings are Arbitrary and Capricious**

135.     The Center re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

136.     When making a warranted-but-precluded finding, the Service is required to articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made. It cannot rely on factors Congress did not intend the agency to consider, ignore an important aspect of the problem, offer an explanation that runs counter to the evidence before the agency, or issue a finding so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

137.     The Service is not making expeditious progress to add species to the lists of endangered and threatened species and has not shown that listing of the Okinawa woodpecker, Kaiser-i-hind swallowtail, Jamaican kite swallowtail, black-backed tanager, Harris' mimic swallowtail, fluminense swallowtail, and the southern helmeted curassow is precluded by pending proposals to determine the status of other species.

138.     The Service has failed to articulate a satisfactory explanation for its warranted-but-precluded findings, failed to articulate how the agency is making expeditious progress to add species to the lists of endangered and threatened species, and failed to articulate how the prompt listing of the seven species was precluded by pending proposals to determine whether any species is an endangered or threatened species. The Service similarly relied on factors Congress did not intend for it to consider, ignored important aspect of the problems, offered an explanation that runs counter to the evidence

before it, and issued findings so implausible that they cannot be ascribed to a difference in view or the product of agency expertise.

139.   Accordingly, the Service's warranted-but-precluded findings are arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court issue an Order as follows:

1.   Declare that Defendants are unlawfully depriving the seven species of protection under the ESA;

2.   Order Defendants to immediately publish proposed rules for the seven species according to a schedule to be fashioned by the Court;

3.   Award Plaintiff its attorneys' fees and costs; and

4.   Award Plaintiff such other relief as the Court deems just and proper.

Dated this 19th day of November, 2021

Respectfully submitted,

 /s/ Sarah Uhlemann
Sarah Uhlemann*
DDC Bar No. 501328
Center for Biological Diversity
2400 80th Street NW, #146
Seattle, WA 98117
(206) 327-2344
suhlemann@biologicaldiversity.org

Tanya Sanerib*
DDC Bar No. 473506
Center for Biological Diversity
2400 80th Street NW, #146
Seattle, WA 98117
(206) 327-2344
tsanerib@biologicaldiversity.org

*Pro Hac Vice Admission  Pending

*Attorneys for Plaintiff Center for Biological Diversity*